UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re Application of GORSOAN LIMITED
and GAZPROMBANK OJSC for an Order
Pursuant to 28 U.S.C. § 1782 to Conduct
Discovery for Use in a Foreign Proceeding,

Petitioner.

------------------------------------------------------------X

Case No.: 13-mc-00397

DECLARATION OF JANNA BULLOCK
IN SUPPORT OF MOTION TO QUASH
SUBPOENAS

JANNA BULLOCK declares under penalties of perjury of the laws of the United States of America pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Movant in this proceeding, and also the sole member of Movant RIGroup LLC (hereinafter "RIGroup USA"). I have personal knowledge of the matters set forth herein, and respectfully submit this declaration in support of Movants' motion: (a) to vacate this Court's December 4, 2013 Discovery Order (granting by memo-endorsement the application, pursuant to 28 U.S.C. § 1782, of Petitioners Gorsoan Limited ("Gorsoan") and Gazprombank OJSC ("Gazprombank")); (b) to quash the resulting subpoenas (the "Subpoenas") issued by Petitioners upon myself, RIGroup LLC, Stuart Smith and Zoe Bullock (see Exhibits 1-2; see also Docket Entries Nos. 3 (Declaration of Owen Pell) at Exhibits 6-9; 7-11 (affidavits of service of subpoenas)); and (c) for certain other and additional relief as set forth in Movants' Notice of Motion and accompanying Memorandum of Law.

**Background**

2. I am a naturalized American citizen, residing in New York, New York.

3. For many years, via numerous companies that I own or control (directly or indirectly), I have engaged the business of real property development and investment in various locations throughout the world. Many of these development projects, both commercial and

residential, have been groundbreaking and award-winning. In the United States, I continue to be the owner and sole member of RIGroup LLC ("RIGroup USA"), a Delaware limited liability company.

4. Until the conspiratorial and wrongful acts described further herein, I was the lawful and legitimate majority shareholder (via a number of corporate entities) of OOO RIGroup ("RIGroup Russia").

5. I began real estate development projects in Russia in 1998 (such projects came to be owned by RIGroup Russia in 2004). At that time, I was married to Alexei Kuznetsov, who served as the Minister of Finance of the Moscow Region until his resignation in 2008. Although my husband had no role as an officer or director of RIGroup Russia (nor did I), as is generally the case in Russia, business operations (including real property development) can only be successfully maintained with high-level political backing.

6. Shortly after my husband's resignation (and, thus, at a time the company lacked the requisite political support in Russia), and at a time when I was traveling outside of Russia, RIGroup Russia (which, as evidenced by its public corporate filings, had significant and lucrative corporate assets) came under attack by well-organized and "experienced" corporate raiders. Indeed, as I later became aware, the raiders' efforts to secure information and documentation concerning RIGroup Russia and its holdings began in approximately September 2006.

7. For the reasons explained further below, the persons responsible for the corporate raiding and looting of RIGroup Russia were extremely bold (as they held political power and the backing of Russian organized crime). These raiders included, but were not limited to, Arkady Rothenberg (a Russian oligarch and billionaire as a result of his longstanding friendship with

2

Vladamir Putin, and 25% owner in Gazprombank and ORSI (the entity that took control of the management of RIGroup Russia and permitted the misappropriation of its assets))[1], Michail Cherkosov, Sergei Gordeev, Alexander Esin, Antonin Belov and Sergei Popov (a known leader of the Podolsk organized crime group, a "ruthless criminal gang in central Moscow"). See Exhibit 3 at ¶¶ 67 and 146.

8. Cherkasov, Popov and Gardeev explained to me (as the initial raiding was about to unfold in 2008) that they intended to take RIGroup Russia and its assets; that they intended the raid to be, in substance, "more spectacular that the raid against Yukos Oil" conducted against Mikhail Khodokowsky (who spent over a decade in a Russian prison until recently pardoned on Putin's whim – perhaps as a political message to the world in advance of the Olympic games to be held in Russia). Later, these raiders stated to me, in substance, that it was their intent to "nail me down" and "drive [me] into bankruptcy."

9. As I later became aware, these raiders viewed RIGroup Russia as a perfect target for a corporate raid because it was connected to an American entrepreneur as its majority shareholder (and, thus, even more susceptible to attack given lingering animosities that exist between Russia and the United States, and given that the corporate raid would also constitute a direct attack against me).

10. The Russian raiders, acting without authorization – but with forged documents and the requisite high-level political backing of others – purported to effect an August 2008

---

[1] In or about 2010 (after the assets of RIGroup Russia were substantially looted and the company forced into bankruptcy), Rothenberg attempted to distance himself from such blatant acts of misappropriation by publicly announcing his "resignation" as a 25% shareholder of ORSI. Rothenberg held a similar 25% interest in Gazprombank – which, as below, now serves as one of the current vehicles for the continuing acts of the Russian raiders.

company-initiated "buyout" in which I (or the companies I controlled) purported to agree to accept shares of an affiliated company, Open Joint Stock Company Rosweb ("Rosweb") in exchange for my shares of RIGroup Russia. See generally Exhibit 4 (Adamidou Affidavit filed in Cyprus action in support of raiders' position) at ¶¶ 17 and 19(a)-(h) (falsely representing that as of 28 August 2008 "Mrs. Bullock – (as well as the Companies controlled by her) - ceased to have any interest or affiliation with [RIGroup Russia]," and similarly misrepresenting that "Later on [RIGroup Russia] sold its shares it purchased to third persons or investors.").

11. The raiders' claim that I "sold" my controlling interest in RIGroup Russia is demonstrably false. In fact, RIGroup Russia filed a document with the Russian Register of Legal Entities representing and disclosing that as of 15 September 2009 – *i.e.* well after the alleged August 2008 company "buyout" – the companies I owned remained shareholders of RIGroup Russia. The filing similarly establishes beyond any doubt that no corporate "buyout" had ever occurred in August 2008 as claimed by the raiders. A true and correct copy of relevant excerpts of RIGroup Russia's 15 September 2009 corporate disclosure is attached hereto in its original Russian language together with an English-language translation as Exhibit 5.

12. As specifically set forth in RIGroup Russia's corporate filing, as of 15 September 2009, the shares of RIGroup Russia were held as follows:

| SHAREHOLDER | SHARES | % |
|---|---:|---:|
| Hotrast Consulting Ltd | 2,618,288,200 | 32.4% |
| Nogion Holdings Ltd | 2,518,764,800 | 31.2% |
| Trivalent Advisors S.A. | 2,048,787,000 | 25.3% |
| Vinilio Consulting Ltd | 462,297,000 | 5.7% |
| RIGroupUSA | 298,863,000 | 3.7% |
| Westbury Fund Ltd | 135,000,000 | 1.7% |

See Exhibit 5 (RIGroup Russia's 15 September 2009 corporate filing) at 2-3.

13. Of the companies listed as shareholders of RIGroup Russia, I am and was the rightful owner of Hotrast Consulting Ltd. ("Hotrast"), Nogion Holdings Ltd. ("Nogion"), Vinilio Consulting Ltd. ("Vinilio") RIGroup USA, and the Westbury Fund Ltd ("Westbury Fund).

14. Notwithstanding the foregoing and the fact that no corporate "buyout" occurred or had in fact taken place (and no consideration ever having been paid in any event), the corporate raiders' wrongful acts culminated in the theft (on paper) of RIGroup Russia itself by the purported transfer of 98% of RIGroup Russia's shares to Amytal Holdings Ltd. ("Amytal"), a Cypriot entity purportedly established on 26 July 2008 for the sole purpose of accepting the proceeds of the theft. See Exhibit 6 (a true and correct copy of relevant excerpts of RIGroup Russia's 25 February 2010 corporate filing disclosing that Amytal had purportedly acquired approximately 98% of RIGroup Russia's shares) at 2. Notably, later news reports stated that I purportedly "gifted" my shares to RIGroup Russia's management – which at that time was Esin (as Director General) and Belov (as CFO).

15. Like those others who have faced the theft of their companies in Russia (discussed further below), I was devastated by the raiders' theft. However, the raiders also instigated a series of purported criminal investigations of both my husband and me, initiated litigation against other companies I own (both in Cyprus and in France), and initiated an Internet smear campaign against me (alleging, among other things that my husband and I were American spies, that my husband transferred $20 billion to companies controlled by the United States CIA, and that I was responsible for the killing of wild mustangs in order to collect their hides for art purposes).

16. Moreover, I have been repeatedly cautioned and threatened (including death threats) not to return to Russia to fight these corporate raiders. And there is real substance

behind these threats against my personal safety. By way of example only, my husband retained legal counsel to represent him in connection with a number of baseless criminal investigations that were initiated at the time of the alleged corporate raid and other thefts. Tragically however, my husband's counsel was shot and murdered in broad daylight on the steps of the prosecutor's office in Pushkino, near Moscow. Indeed, these Russian raiders are not afraid to put in writing the fact that organized criminal elements are involved. See Exhibit 7 (e-mail from Esin to Stuart Sundlun, dated February 21, 2012, stating that "… in some cases when trying to return the funds or assets to RIG[roup] the bandits appeared with a large criminal record").

17. The raiders' acts, including the commencement of purported criminal investigations against me, deprive me of any real ability to challenge their theft in Russia. And with no barriers in place to bar their looting, the raiders liquidated RIGroup Russia's assets and then forced the company into bankruptcy, which the raiders apparently purchased – undoubtedly for pennies – the fraudulent debt that they themselves created. See, e.g., Exhibit 8 (RIGroup Russia bankruptcy liquidation docket).

18. Having first misappropriated all of my corporate assets located in Russia, the Russia raiders have now set their targets on my assets located outside of Russia (including but not limited to two hotels which I beneficially own in Courcheval, France).

19. The Cyprus Proceedings underlying Petitioners' Application are the Russian raiders second litigation attempt in Cyprus to misappropriate additional asserts. Their first attempt was initiated against me by RIGroup Russia itself after the raiders stole control of that company. However, that case was ultimately dismissed by the Cyprus Court with prejudice. Indeed, my French counsel recently met with these Russian raiders in Moscow, and the raiders readily confirmed that the current Cyprus Proceedings – brought in the name of Gazprombank

(an entity they control) and the faceless entity Gorsoan[2] (a Cypriot shelf-company, itself suspected by the Cypriot authorities of financial improprieties (*i.e.*, money laundering) such that its bank account was frozen (see Exhibit 9)) – were initiated for and on behalf of these Russian Raiders. Similarly, the raiders shamelessly admitted that they were responsible for wrongfully instigating Russian criminal investigations against me and my former husband (but stated, in substance, that it was "too late" to end such wrongful criminal prosecution).

**Further Background of Russian Corporate Raiding**

20. Corporate raiding (in Russian, "reiderstvo") and the theft of assets has had a long history in Russia and is commonplace. See generally Exhibit 11 (Time Magazine article dated 19 Dec. 2009 entitled The Danger of Doing Business in Russia) (describing the Russian corporate raid upon the investment firm Hermitage Capital, estimating that thousands of such corporate raids occur in Russia each year, and explaining that "reiderstvo, or 'raiding,' [is] a term that describes an array of illegal tactics – including identity theft, forgery, bribery and physical intimidation – used by corrupt policemen, tax officials, lawyers and financiers to seize a person's business or property"); Exhibit 12 (Spiegel article dated 6 June 2008 entitled A Culture of Lawlessness: Russia's Raiders) (Some 8,000 companies a year are targets of lawsuits or

---

[2] According to publicly filed documents (see Exhibit 9), Gorsoan is a corporation organized and existing under the laws of Cyprus. It was formed on March 15, 2010. The shareholder of Gorsoan is Mesoch Corporate Services Ltd. ("Mesoch"), a Cypriot corporate services company located in Nicosia, Cyprus. The shareholder of Mesoch is Doros Zavallis who is the same Doros Zavallis associated with the law firm of Michaelides & Zavallis Advocates, with offices located at the same address of Mesoch. Id.; see also Exhibit 10. Victoriya Spivak, who serves as director of Gorsoan, and who serves as a director of Mesoch together with Zavallis, is an employee of Zavallis and/or Michaelides & Zavallis Advocates. Mesoch (as shareholder of Gorsoan) and Spivak (as director) are nominee shareholders and directors who are installed in those positions in order to hide the identity of the true beneficial owners of Gorsoan. Gorsoan has participated in litigation before the Russian courts for a number of years and, as disclosed in various filings made in such proceedings, maintains an office in Moscow (thus establishing that various, but as of yet undisclosed parties in Russia are connected with Gorsoan and its operations).

investigations at the behest of rivals seeking to put them out of business or take them over, the Russian Chamber of Commerce & Industry says. Russians call this process reiderstvo, or raiding."); Exhibit 13 (Center for International Private Enterprise, Evolving Corruption: hostile Takeovers, Corporate Raiding; and Company Capture in Russia, by Alexander Settles, PhD., August 31, 2009); Exhibit 14 (Wharton School of the University of Pennsylvania, Hostile Takeovers: Russian Style, dated April 20, 2009) (describing corporate raid upon the Yukos Oil, and noting that "[a]ccording to some estimates, approximately 70,000 Russian companies a year become targets of attacks"); Exhibit15 (American University's Kogod School of Business, Russia's Corrupt Free Market) ("[M]ore than 20 years after the fall of the Soviet Union, intimidation and corruption against business owners is rampant. Media reports estimate that up to 70,000 cases of corporate raiding – reiderstvo in Russian – occur each year."); Exhibit 16 (The Washington Post, 'Raiding' Underlines Russian Legal Dysfunction, by Philip P. Pan, August 13, 2009) ("No crime illustrates the state of the [Russian] legal system better than what is known as 'reiderstvo,' or raiding – the takeover of businesses through court rulings and other ostensibly legal means with the help of crooked judges or police.").

21. Such corporate raiding activities include (as used against me) the wrongful use of criminal investigations against the legitimate business owners as a means to quash any resistance to the raid and to provide time for the raiders to complete their theft. See Exhibit 17 (U.S.A. Magnitsky Act) at 18 (noting that the raid of the Russian affiliate of an United States company, Hermitage Capital Management, included the wrongful criminal arrest, detention, abuse and death of Hermitage's lawyer Sergei Magnitsky: "The Human Rights Council concluded that Sergei Magnitsky's arrest and detention was illegal"); Exhibit 11 (Time Magazine article dated 19 Dec. 2009 entitled The Danger of Doing Business in Russia) (discussing Magnitsky's

8

wrongful arrest and death; noting that "[the Russian prison] Butyrka is teeming with entrepreneurs locked up on phony charges brought against them in raider attacks"); Exhibit 12 (Spiegel article dated 6 June 2008 entitled A Culture of Lawlessness: Russia's Raiders) ("Companies are paying public officials to raid the offices of business rivals and subject them to criminal investigations. [...] Getting police to open a criminal investigation costs $20,000 to $50,000 ...."); Exhibit 13 (Center for International Private Enterprise, Evolving Corruption: hostile Takeovers, Corporate Raiding; and Company Capture in Russia, by Alexander Settles, PhD., August 31, 2009) at 3 ("They [raiders] may also utilize law enforcement agencies to open an investigation to seize key company documents, which can later be falsified to transfer ownership to the raider;" "Evroset's owner and chairman ... was also interrogated in relation to a series of criminal cases filed against the firm and its top managers by the General Prosecutor's Office Investigations Committee in 2008."); Exhibit 15 (American University's Kogod School of Business, Russia's Corrupt Free Market) (noting that "One in six Russian businessmen has been prosecuted for an alleged economic crime over the past decade ..." and documenting the story of Evgeniy Konovalov – "Though the charges [against him] were fabricated – it was eventually proved in court that forged documents were used to purchase his firm – he spent a year under arrest."); Exhibit 16 (The Washington Post, 'Raiding' Underlines Russian Legal Dysfunction, by Philip P. Pan, August 13, 2009) ("The practice [of corporate raiding] is so widespread that the local media have reported what raiders charge: ... $50,000 to open a criminal case, $300,000 for a court order.").

22. These trumped up and fictitious criminal proceedings and politically-driven persecution brought against me in Russia (to cover for the corporate raid of RIGroup Russia) are classic examples of what the governments of both Russia and the United States have declared to

9

be illegal practices and in violation of one's human rights. See Exhibits 18-19 (discussing Russia's "Corporate Raiding Law," Fed. Law No. 147-FZ); Exhibit 17 (U.S. "Magnitsky Rule of Law Accountability Act of 2012") (United States Congressional findings that such corporate raiding activities in Russia, including improper criminal investigations as to the actual victims of such raiding activities, is "emblematic of a broader pattern of disregard for the numerous domestic and international human rights commitments of the Russian Federation and impunity for those who violate basic human rights and freedoms," and "evoke serious concerns about the right to a fair trial and the independence of the judiciary in the Russian Federation"); see also Exhibit 20 (relevant excerpt: United States Department of State, Bureau of Democracy, Human Rights and Labour, Country Reports on Human Rights Practices for 2011 – Russia) at 8 ("Magnitskiy was arrested on trumped-up charges, in breach of Russian law and the European Human Rights Convention") at 14-15 ("[The ECHR] ruled that Russia violated Yukos' right to the protection of property and that Russian authorities violated provisions of the European Convention on Human Rights, including Article 6, the right to a fair trial."); Exhibit 21 (relevant excerpt: United States Department of State, Bureau of Democracy, Human Rights and Labour, Country Reports on Human Rights Practices for 2009 – Russia) at 1, 54-59 ("Rule of law and due process violations remained a problem [in Russia]. Corruption was widespread throughout the executive, legislative, and judicial branches, and officials often engaged in corrupt practices. Corruption in law enforcement remained a serious problem."); Exhibit 22 (relevant excerpt: United States Department of State, 2012 Investment Climate Statement – Russia) at 1, 3, 6-7 ("Unfortunately, corruption plays a sizeable role in the [Russian] judicial system;" "According to numerous reports, corruption in the judicial system is widespread and takes many forms, ranging from bribes of judges and prosecutors to fabrication of evidence.").

23. Petitioners and their counsel are fully familiar with these criminal investigations as against me, as Petitoners included references and purported testimony related thereto in connection with Gorsoan's application in Cyprus in support of an *ex parte* asset freezing order. See Exhibit 23 (Sirotkin Affidavit) (English translation provided by Defendant Gorsoan) at ¶¶ 43, 71.

**The Raiders Commence Legal Proceedings in Cyprus**

24. On or about July 29, 2009, the Russian raiders caused RIGroup Russia to initiate a civil action in the courts of Cyprus (hereafter, "Cyprus Action No. 1," District Court of Limassol Action No. 3423/2009) against RIGroup USA, among others, seeking to enforce a purported loan agreement as between RIGroup Russia and the Cypriot company Laziar Holding Ltd. ("Laziar") in the principal amount of 34,110,000 euros (the purported "Laziar Loan"). See Exhibit 4.

25. RIGroup Russia claimed in that action (contrary to the submissions of Gorsoan and Gazprombank in Cyprus Action No. 2, described below), that it borrowed monies from Svyaz Banks (a Russian bank) in order to satisfy its loan commitment to Laziar, and that Bullock and RIGroup USA used these borrowed funds to purchase a number of hotels in Courchevel, France (hereafter, the "French Hotels"). Id. In essence, by Cyprus Action No. 1, the Russian raiders sought to wrongly and unlawfully take possession of the French Hotels.

26. RIGroup USA and its affiliated companies defended Cyprus Action No. 1 on the merits, and submitted to the court documentation establishing that (a) those purported to act on behalf of RIGroup Russia were in fact corporate raiders, having no legitimate standing to so act; and (b) that the purported Laziar Loan was a fraud, and that Plaintiffs' purchase of the French Hotels was legitimately funded by Bullock's sale of RIGrroup Russia shares (as documented in its own quarterly financial statements), and not by any after-the-fact "loan."

27. Apparently recognizing the futility of further pursuing the claims asserted in Cyprus Action No. 1, that case languished for years before the claims were ultimately dismissed with prejudice by the Cyprus Court's Order of March 14, 2013. Nonetheless, the Russian raiders (by their appointed delegate Esin) approached me and offered to "sell" me a number of purported "loans," including the Laziar loan, for 10% on the dollar. I refused such extortionate demands. When I commenced a civil action against Esin and certain of his co-conspirators in New York, and after Esin was personally served in connection with this action, he threatened me in an attempt to force me to withdraw my claims against him.

28. Specifically, on June 28, 2012, Esin e-mailed Stuart Sundlun, an intermediary (attached as Exhibit 24), stating that "Janna [Bullock] continues [her] litigation against me. [...] I don't know why she does it. There will be a big scandal that will bring nothing but harm to her." Later, Esin again threatened me, via Sundlun, asserting that unless I withdrew my claims against him, he and others would retaliate against me and seek to ruin me and my family.

29. Shortly after Esin made these threats, I received anonymous death threats via the Internet. At the same time, Gorsoan commenced a second action against RIGroup USA and I, among others, in Cyprus (the "Cyprus Action No. 2;" District Court of Limassol Action No. 3573/2012) initiated by way of an *ex parte* motion for a global asset freeze and injunction. To date, I have not been properly served with a copy of the March 6, 2013 Cyprus "Freezing and Disclosure Order."

30. In Cyprus Action No. 2, Gorsoan falsely asserts that I somehow fraudulently diverted assets to my own benefit (although even Gorsoan admits in its supporting papers that neither I nor any entity owned by me was an issuer of (or guarantor of) any promissory note

upon which Gorsoan seeks recovery, and that Gorsoan's speculation as to diverted assets is multiple steps and/or business transactions removed from me and/or any of my companies).

31. The Cyprus Proceedings initiated on or about August 3, 2012 by Gorsoan and Gazprombank were wrongfully initiated against me to harass, and in response to my claims against certain of the Russian raiders in the United States (originally initiated in the New York State Court on March 15, 2012 via the filing of summons with notice, and removed to the District Court for the Southern District of New York).

32. Thus, I respectfully submit that Petitioners' application for discovery, as well as the overly-broad and unduly burdensome Subpoenas which were later served, are intended for improper purposes – to harass and to seek asset disclosure such to advance the raiders' wrongful attempts to misappropriate assets. Moreover, I am advised by counsel that Petitioners' application for discovery would vitiate my appeal of the Cyprus Freezing and Disclosure Order that is currently pending, and is otherwise at odds with settled Cyprus Civil Procedure Rules.

33. This Court should not condone the acts of these Russian raiders. For each of the foregoing reasons, Movants' motion to vacate this Court's December 4, 2013 Discovery Order or, in the alternative, to quash the resulting Subpoenas should be granted.

I declare under penalties of perjury that the foregoing is true and correct.

Dated: 3 January 2014

JANNA BULLOCK